IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN-DUBUQUE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR 21-01016-CJW-MAR |
| | ) | |
| vs. | ) | |
| | ) | |
| DERRICK DARRYL TRAWICK, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S TRIAL MEMORANDUM**

**I.     PRE-TRIAL STATEMENT AS TO THE STATUS OF THE CASE**

(a)    This case is set for trial to a jury on January 24, 2022. Jury selection is scheduled before Magistrate Judge Roberts the morning of January 24, 2022.

(b)    The estimate of the probable duration of the trial is 3 to 4 days, including jury selection.

(c)    The defendant is detained.

(d)    An interpreter is not required in this matter.

(e)    It is not proposed that a jury be waived.

(f)    Joint Proposed Jury Instructions have been filed by the parties. The government has filed objections and responses regarding contested jury instructions.

1

(g) The defendant is charged in one count: aiding and abetting the distribution of a controlled substance near a protected location resulting in serious bodily injury. The elements for these charges are as follows:

**Count 1:** **Aiding and Abetting the Distribution of Controlled Substances Near a Protected Location Resulting in Serious Bodily Injury (21 U.S.C. §§ 841(a)(1), (b)(1)(C)), 860(a))**

In order to have aided and abetted the commission of a crime, a person must, before or at the time the crime was committed:

*One*, have known the distribution of a controlled substance was being committed or going to be committed;

*Two*, have had enough advance knowledge of the extent and character of the crime of distribution of a controlled substance that he was able to make the relevant choice to walk away from the crime before all elements of the distribution of a controlled substance were complete;

*Three,* have knowingly acted in some way for the purpose of causing, encouraging, or aiding the commission of the distribution of a controlled substance;

*Four,* have intended that the distribution of a controlled substance occur.

The crime of distribution of a controlled substance near a protected location has three elements, which are:

*One,* on or about May 31, 2019, in the Northern District of Iowa, a person intentionally transferred heroin and fentanyl to another individual;

*Two,* at the time of the transfer, the person who made the transfer

2

> knew that the substance transferred was some controlled substance; and
>
> *Three,*     the distribution of a controlled substance occurred within 1,000 feet of the real property comprising a playground, specifically, Jefferson Park in Dubuque.

As a **sentencing factor**, the government would have to prove beyond a reasonable doubt that another person's use of the heroin and/or fentanyl defendant distributed resulted in serious bodily injury to that person. In this case, the Indictment alleges the use of heroin and/or fentanyl, the distribution of which defendant aided and abetted, resulted in serious bodily injury to M.M.

(h)     **Relevant Statutes**

Title 21, United States Code, Section 841(a)(1), provides:

> [I]t shall be unlawful for any person knowingly or intentionally to . . . distribute . . . or possess with intent to . . . distribute . . . a controlled substance.

Title 21, United States Code, Section 841(b)(1)(C) provide for enhanced penalties where "death or serious bodily injury results from the use of [the] substance."

Title 21 of the United States Code, Section 860(a), provides enhanced penalties for:

> Any person who violates section 841(a)(1) of [Title 21] . . . by distributing [or] possessing with intent to distribute . . . a controlled substance in or on, or within one thousand feet of, the real property comprising . . . a playground.

## II.     POTENTIAL EVIDENTIARY ISSUES

**a)**     **Expert Testimony** – The United States will present expert testimony in various forms in order to prove the elements of the offenses. First, the United States will offer the testimony of one or more experienced drug agents to testify as

3

an expert witness regarding drug trafficking generally. *United States v. Gill*, 513 F.3d 836, 847 (8th Cir. 2008) ("[A] district court has discretion to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers in areas concerning activities which are not something with which most jurors are familiar." (quotation omitted)). The agent(s) will testify regarding the various methods of distributing, packaging, and concealing heroin, as well as prices associated with various quantities of heroin in the Dubuque, Iowa, area, and the effects of heroin use on a person.

Proper testimony in this area includes testimony about the forms, sources, prices, and dosage units of various drugs. *See United States v. Martin*, 869 F.2d 1118, 1121 (8th Cir. 1989). The United States anticipates calling one of its fact witnesses involved in the investigation as the drug expert. In order to avoid any issues with "dual role" expert/lay testimony by the drug expert officer, the United States proposes that the witness's testimony be bifurcated, and that he testify twice during the government's case-in-chief. *See United States v. Moralez*, 808 F.3d 362 (8th Cir. 2015) (discussing "dual-role" testimony, where a case agent testifies both as an expert and a fact witness and discussing safeguards to avoid potential prejudice from dual-role testimony, such as bifurcation of testimony, using clear transitions during questioning, or giving jury instructions regarding expert testimony).

4

Second, the United States will offer the testimony of Dr. Joshua Pruitt, a board-certified emergency medicine physician and medical examiner. Dr. Pruitt will testify regarding the cause and extent of injuries to M.M. Specifically, Dr. Pruitt will testify that the injuries to M.M. were the result of the use of an opiate. Additionally, Dr. Pruitt will testify that the nature of the injuries (such as the lack of consciousness, a slowed or nonexistent pulse, and severely slowed or nonexistent breathing) indicated that M.M. had a substantial risk of anoxic brain injury and death without medical intervention.

Finally, as discussed in the pretrial motion briefing and at the final pretrial hearing, the United States will offer the testimony of a specially trained Special Agent with the FBI, Nathan Houpt. Special Agent Houpt will testify about the approximate locations of defendant's phone and M.M.'s phones during the early morning hours of May 31, as determined by historical cell site information provided by the service providers for the two devices.

**b)** **Testimony of First Responders and Medical Personnel --** The United States will offer the testimony of treating medical personnel, including responding law enforcement officers and a paramedic concerning their observations of M.M. and her condition at the time they arrived.

**c)** **Playground and School Location.** The United States will offer a map created by the Dubuque GIS showing the proximity of the location of the drug

5

distribution to Jefferson Park, as alleged in the Indictment. The United States also will offer photographs of the playground.

**d) Prior Convictions** - If defendant testifies at trial, the United States intends to introduce evidence of two of defendant's prior convictions for impeachment purposes pursuant to Fed. R. Evid. 609(a). Defendant has three prior qualifying felony convictions: one in 2018 for domestic abuse assault causing bodily injury and two convictions in 2021 for assault with intent to commit sexual abuse. If defendant testifies, the United States would seek to impeach him with his prior felony convictions (Rule 609(a)(1)).

**e) Laboratory Reports.** The United States will offer a laboratory report compiled from the testing of drugs and other items seized by law enforcement from the residence where the overdose occurred, as well as from the search of defendant's residence. The United States will introduce these reports pursuant to Federal Rule of Evidence 803(6) as records of regularly conducted activity. *See United States v. Baker*, 855 F.2d 1353, 1359-60 (8th Cir. 1988). The United States anticipates calling a criminalist with the Iowa DCI Laboratory to testify regarding his findings.

Additionally, the United States will offer a report of testing of M.M.'s blood done by a chemist for FBI who now works for the Food and Drug Administration. The United States will call the chemist to testify regarding his findings.

6

**f)     Recordings.**   The United States will offer at least one audio recording of admissions made by defendant during a post-*Miranda* interview.   The United States does not intend to offer or play the entire recording.   An edited version of the video recording will be provided to the defense and court prior to the trial.

Additionally, Dubuque Police Officers at the overdose scene were equipped with body cameras.   The United States will offer a portion of at least one video from the overdose scene, which will be shortened to the time frame in which M.M. is present in the room.   The United States will provide advance copies of the proposed exhibit to defendant and the Court prior to trial.

## III.   PRE-TRIAL OPENING STATEMENT

During at least 2019, defendant sold heroin in the Dubuque, Iowa, area.   His customers included, among others, individuals with the initials J.I., M.M., and C.M.   Defendant's customers would communicate with defendant through his cell phone or Facebook account.

In the early morning hours of May 31, 2019, M.M. and C.M. communicated with defendant by cellular telephone to arrange to purchase heroin from him.  They contacted defendant by calling and texting him at phone number with the last four digits of 8334.   A total of five phone calls and four text messages were exchanged between M.M.'s phone and defendant's phone between approximately 12:57 a.m. and 1:40 a.m. on May 31, 2019.

As instructed by defendant, M.M. and C.M. drove to a gas station on 14th and Central in Dubuque. Defendant drove a vehicle to the gas station and was accompanied by another individual. While at the gas station, M.M. briefly entered defendant's vehicle, at which time defendant instructed M.M. to follow him to the area of Walnut Street and to park around the corner from his residence. Defendant then drove to his residence on Walnut Street and M.M. followed him there in M.M.'s vehicle. After they arrived in the area of defendant's residence, defendant and the other individual in his vehicle went inside the residence, while M.M. and C.M. parked around the corner as directed. Defendant's residence on Walnut Street was approximately 100 feet from Jefferson Park, and the location where M.M. and C.M. parked was on the street immediately adjacent to the park. Shortly after defendant and the other individual went inside defendant's residence, the other individual exited the residence, walked to M.M.'s vehicle, and handed her a package containing purported heroin in exchange for approximately $38.[1]

After the drug transaction, M.M. and C.M. then drove to the Glenwood Motel in Dubuque. As soon as they arrived at the motel, M.M. and C.M. prepared the purported heroin for injection. They left some of the purported heroin in lines on a television stand for two friends of theirs, A.M. and D.F. M.M. injected the purported heroin that she had obtained during the transaction with defendant and

---

[1] The typical price defendant charged for a baggie of heroin was $40. On May 31, 2019, C.M. and M.M. were not able to acquire a full $40, so they gave defendant's associate the approximately $38, hoping that he would not notice.

8

his associate and almost immediately suffered an overdose during which she stopped breathing. C.M. instructed A.M. to call 911, and C.M. attempted to administer naloxone to reverse the overdose. C.M. attempted to administer naloxone multiple times, but struggled with the needles and was only able to get a portion of the naloxone injected into M.M.

Emergency responders arrived on the scene and found M.M. unresponsive, eyes open, and not breathing. Her skin was turning pale. While an officer prepared an AED, a paramedic arrived on scene and began CPR. Shortly after the paramedic started the first round of chest compressions on M.M., she suddenly started breathing and sat up. Testimony will establish that, without medical intervention (including the use of naloxone), M.M. had a substantial risk of death due to the use of opioids.

After M.M. was revived, law enforcement conducted an investigation into the source of the drugs, which included a search of M.M.'s phone contacts from immediately prior to the overdose. Those contacts included both text message and voice contacts with defendant's phone number (ending in 8334) in which M.M. arranged to meet with defendant. They also obtained video from Dubuque traffic cameras which traced defendant and his associate from defendant's residence, to the gas station, and back to his residence. They also observed and captured traffic camera video of M.M.'s vehicle driving to the gas station, following defendant's vehicle to defendant's residence, and to the area of the motel, as described above.

Testing of the powder found on the television stand in the motel room determined that it contained heroin and fentanyl. M.M. was transported to the hospital, where a blood sample was taken. After M.M. was released from the hospital, investigators obtained the remaining portion of the blood sample from the hospital and sent it for analysis by the FBI. Testing of that blood determined that it contained metabolites of heroin, fentanyl, and methamphetamine.

Based on the traffic camera videos showing that M.M. had met with defendant within approximately 30 minutes of the 911 call, investigators obtained a search warrant for the Walnut Street residence. During the search of the residence, officers located and seized several drug-distribution related items, including plastic baggies missing corners, gloves, and digital scales. Investigators also located and collected a powder substance on a living room table that later tested positive for methamphetamine, heroin, and fentanyl. Investigators also seized 33 pills that appeared to be ecstasy (which were determined to contain methamphetamine), multiple baggies of marijuana, and approximately 2.65 grams of powder cocaine.

During the search investigators also seized two phones: an iPhone and a ZTE phone. Defendant claimed the iPhone was his but denied that the ZTE phone was his. An investigator scrolled through the iPhone and noted several messages consistent with drug dealing and other messages in which the user of the phone (presumably defendant) indicated that he had a new number—the number ending

10

in 8334 that had been contacted by M.M.[2] Investigators later obtained a search warrant for the ZTE phone and performed a download of that phone. The download confirmed that the number for the phone was the number ending in 8334. Review of the downloaded text messages and picture messages showed dozens of photographs and text messages consistent with defendant being the user of the phone and consistent with him selling drugs. Investigators also obtained call detail and cell tower records from the service providers for defendant's ZTE phone and M.M.'s phone. The call detail records confirmed the contacts between the phones during the early hours of May 31. The cell tower records demonstrate that the calls placed by M.M. and defendant during the early morning hours were routed through towers that were consistent with their locations as described by M.M. and C.M., and as shown by the traffic cameras.

Respectfully submitted,

SEAN R. BERRY
United States Attorney

By, s/Dan Chatham

DAN CHATHAM
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, IA 52401-2101
(319) 363-6333
(319) 363-1990 (Fax)
Dan.Chatham@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2022, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the parties or attorneys of record.

UNITED STATES ATTORNEY

BY: /s/ Dan Chatham

COPIES TO: Leon Spies

---

[2] Because investigators did not have the passcode for the iPhone, a download of the phone was not possible. The investigator documented the messages in the iPhone by taking a video recording while he was scrolling through messages on the phone.

11